# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHERINE ANN DEEP, )<br><br>Plaintiff, )<br><br>vs. )<br><br>ELI LILLY AND COMPANY. )<br><br>Defendant. ) | CIVIL ACTION No. 1:06-cv-00111-RWR |

## DEFENDANT ELI LILLY AND COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This is a products liability action allegedly involving the prescription drug diethylstilbestrol ("stilbestrol" or "DES"), an unpatented synthetic estrogen used for decades to treat a variety of conditions, including the treatment of some types of cancer and some accidents of pregnancy. On January 10, 2006, plaintiff Catherine Ann Deep ("plaintiff") filed this action against Eli Lilly and Company ("Lilly"), alleging that her mother, Mary Catherine McGregor ("plaintiff's mother"), ingested DES during her pregnancy with plaintiff in 1961-62 and that, as a result, plaintiff sustained abnormalities of her reproductive tract including uterine and cervical malformations and infertility. Lilly now moves for summary judgment because the undisputed facts and relevant law establish that plaintiff's claims fail as a matter of law.

First, Maryland law requires plaintiff to prove that she was exposed to DES. Plaintiff, however, has no admissible evidence that her mother ingested DES during her pregnancy with plaintiff. Plaintiff has identified no pharmacy, medical or other records showing that plaintiff's mother took DES during her pregnancy with plaintiff. Instead, plaintiff offers inadmissible hearsay testimony that her mother was prescribed DES during her pregnancy with

plaintiff. In the absence of admissible evidence that plaintiff was exposed *in utero* to DES, plaintiff cannot prove an essential element of her cause of action and Lilly is entitled to summary judgment.

Second, under Maryland law, plaintiff must prove by a preponderance of the evidence that Lilly caused her alleged inability to have a child . Plaintiff claims DES caused her to have a misshapen T-shaped uterus and that, as a result, she is unable to have a baby. According to Maryland courts, plaintiff's claims will fail on causation grounds unless she can prove that it is more likely than not that Lilly caused her alleged inability to have a child. Plaintiff's expert, Dr. Robert J. Stillman, testified that, in his opinion, DES caused plaintiff's uterine deformity. He also testified that plaintiff's uterine deformity causes no problems or difficulty to plaintiff outside of her reproductive capabilities. Dr. Stillman also testified that any 43-year-old woman in the general population has a less than 50% chance of conceiving and having a live birth. Since plaintiff has failed to provide any expert testimony that it is more likely than not that Lilly – as opposed to plaintiff's advanced maternal age – caused her alleged inability to conceive and carry a child to term, plaintiff's claims against Lilly fail as a matter of law.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.    Plaintiff alleges that her mother, Mary Catherine McGregor, ingested DES during her pregnancy with plaintiff in 1961-62 and that, as a result, plaintiff sustained certain injuries to her reproductive tract that have prevented her from having a child.[1]    (Plaintiff's Complaint, ¶¶3, 4;  Plaintiff's Answers to Defendant's First Set of Interrogatories, Nos. 11, 17, & 20, excerpts attached hereto as Exhibit 1.)

---

[1]    For purposes of this motion only, Lilly does not contest plaintiff's allegations and testimony cited herein, including her allegation that she sustained injuries she alleges were caused by DES exposure. However, if this action is not disposed of by this motion for summary judgment, Lilly will present evidence at trial and contend, among other things, that plaintiff has failed to prove that her alleged DES exposure caused her to sustain any injuries. In particular, Lilly will present expert testimony, evidence from the medical records, and other evidence that plaintiff's medical problems are unrelated to DES exposure.

138487v1

2.      Plaintiff's mother was pregnant with her in 1961-62 in Tacoma Park, Maryland. (Exhibit 1, Nos. 11 & 17.) Plaintiff has lived in Maryland since her birth. (Exhibit 1, No. 2.)

3.      Plaintiff's mother <u>denied taking DES</u> or "anything like that" when originally asked by her daughter. (Mary Catherine McGregor's Deposition, Exhibit 2, p. 62, lines 10-17).

4.      Plaintiff has no records of her mother's pregnancy with her. (*See* Plaintiff Catherine Ann Deep Response to Defendant Eli Lilly and Company's First Request for Production of Documents or Tangible Things, excerpts attached hereto as Exhibit 3, No. 3.)

5.      The pregnancy history section of plaintiff's mother's gynecological records contain absolutely no indication that she ingested DES during any of her pregnancies, including her pregnancy with plaintiff. (*See* Mary Deep (McGregor)'s 10/5/1994 record from Atiya H. Gopalani, M.D., attached hereto as Exhibit 4; Mary (Deep) McGregor's 8/22/2005 record from Mary Heather Sine, M.D., attached hereto as Exhibit 5)

6.      Plaintiff's medical records note that her mother denied taking DES. (*See* plaintiff's 8/8/2005 and 8/11/2005 records from Atiya H. Gopalani, M.D., attached hereto as Exhibit 6.)

7.      Plaintiff's mother testified that when plaintiff – who was crying – mentioned to her mother that "she had gone to a doctor who said she couldn't have a baby because of [DES]" and that DES is the same as diethylstilbestrol, plaintiff's mother realized she had taken "diethbestrol." (Plaintiff's Deposition, Exhibit 7, pp. 70, lines 6-22; 71 lines 1-22; 72, lines 1-7; Exhibit 2, p. 61, lines 13-17; p. 67, lines 11-18).

8.      Plaintiff alleges that Dr. James Frawley prescribed DES for plaintiff's mother during her pregnancy with her in Maryland and that her mother filled her DES prescription in Maryland. (Exhibit 1, No. 20.)

-3-

138487v1

9.     Dr. James Frawley is deceased. (Exhibit 2, p. 29, line 20.)

10.    Plaintiff's mother testified that she does not remember Dr. Frawley telling her what he was prescribing to her during her pregnancy with plaintiff, but that she remembers reading "diethylstilbestrol" on the label of the prescription bottle. (Exhibit 2, at p. 36, lines 12-22; p. 37, lines 1-5.)

11.    Plaintiff's mother testified that the DES she allegedly ingested during her pregnancy with plaintiff was a little bit bigger than an aspirin, white, round, and cross-scored. (Exhibit 2, at p. 40, lines 6-17; p 41, lines 1-10.) She does not recall any other details of the pill itself. (Exhibit 2, at p. 41, lines 7-11.)

12.    Plaintiff began trying to conceive in May 2005, one month shy of her 43rd birthday. (Exhibit 1, No. 9.)

13.    Plaintiff's treater and medical expert, Robert J. Stillman, M.D. stated that, when plaintiff first visited him at age 43, he would have discussed with plaintiff her advanced reproductive age, "an important factor" in her likelihood of conceiving and carrying a child to live birth. (Dr. Stillman Deposition, Exhibit 8, p. 82-84, lines 19-22; 1-22; 1-13.)

14.    Dr. Stillman testified that a 43-year-old **with no reproductive abnormalities** has a less than 50% chance of conceiving and carrying a child to term, even with the use of assisted reproductive technologies. (Exhibit 8, p. 97-98, lines 7-22; 1-10.)

15.    Dr. Stillman testified that in the general population, the likelihood of a 43-year-old having a live birth is "at least one in three," (Exhibit 8, p. 29, lines 17-22), and the miscarriage rate of a 43-year-old who actually conceives is between 33-50%. (Exhibit 8, p. 23-24, lines 20-23; 1-4.)

16.    Dr. Stillman also testified that at his fertility clinic, only 20% of 43-year-old women are able to conceive and only 14% of 43-year-old women are able to carry their pregnancies through to a live birth. (Exhibit 8, p. 28, lines 11-18.)

-4-

138487v1

17.    Dr. Stillman could not testify that it is more likely than not that plaintiff, but for her alleged DES exposure, would have been able to conceive and carry a child to term. (Exhibit 8, p. 93, lines 3-20.) Rather, he testified that plaintiff's age and uterus shape are both "contributing factor[s]" to her inability to conceive and carry a child to term, but that "it's hard to know which one is the majority factor." (*Id.*)

18.    Dr. Stillman could not testify to a reasonable medical probability that plaintiff did not conceive because of DES exposure. (Exhibit 8, p. 91-92, lines 17-22; 1-11.)

19.    Dr. Stillman testified that plaintiff's uterine deformity causes no problems or difficulty to plaintiff outside of her reproductive capabilities. (Exhibit 8, p. 110, lines 9-14.)

## LAW AND ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the moving party is entitled to judgment as a matter of law based on the undisputed material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Id.* at 327.

The party moving for summary judgment bears the initial responsibility of identifying the documents and testimony which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. Once the moving party has shown the absence of a genuine issue of material fact, the burden shifts to the non-moving party to set forth affirmative admissible evidence and specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-250 (1986); Fed. R. Civ. P. R. 56(e). The non-moving party must do more than express doubt as to the truth of the moving party's factual submissions, and must show "concrete evidence from which a reasonable juror could return a verdict in his favor."

-5-

*Id.* at 256. Showing "some metaphysical doubt" as to the material facts, making conclusory allegations or unsubstantiated assertions, or offering only a "scintilla" of evidence is not sufficient to satisfy the non-movant's burden. *See id.* at 252; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II.    MARYLAND LAW APPLIES TO PLAINTIFF'S CLAIMS

Courts in the District of Columbia apply a governmental interests approach in determining which interested state's laws apply to substantive questions. *Nix v. Hoke*, 139 F. Supp. 2d 125, 131 (D.D.C. 2001). In determining which jurisdiction has a greater interest in having its laws apply, the District of Columbia considers four factors: (1) the place of the injury; (2) the place where the conduct occurred; (3) the place where the relationship between the parties is centered; and (4) the domicile of the parties. *Id.* at 131-132. Weighing these factors in this case demonstrates that the Court should apply Maryland law to the substantive issues of this case.

Maryland is the place of plaintiff's alleged injury, the place where the alleged tortious conduct occurred and the place where the relationship between the parties is centered. Specifically, plaintiff's mother was pregnant with her in Maryland. (SOF, ¶2.) Plaintiff alleges that her mother was prescribed DES, purchased DES and ingested DES in Maryland. (*Id.* at ¶¶ 2 & 8.) Plaintiff alleges she was exposed to DES *in utero* in Maryland. (SOF, ¶2.) Finally, plaintiff experienced the medical conditions she attributes to her DES exposure in Maryland. (SOF, ¶2.) Accordingly, an analysis of the first three government interest factors requires application of Maryland law.

The fourth factor considered by District of Columbia courts, the domicile of the parties, also requires the application of Maryland law. Plaintiff is domiciled in Maryland, where she has lived her entire life. (SOF, ¶2.) Lilly is incorporated and has its principal place of business in Indiana. There is a connection between the domicile of plaintiff – Maryland – and

the acts and occurrences allegedly giving rise to plaintiff's claims; conversely, there is no connection with Indiana, other than that Lilly is domiciled there. Thus, based on the domicile of the parties, Maryland has a greater interest in having its law applied than Indiana or the District of Columbia.

Under the governmental interests approach applied by courts in the District of Columbia, Maryland substantive law applies in this case.

### III.    PLAINTIFF CANNOT PROVE THAT HER MOTHER INGESTED DES DURING HER PREGNANCY WITH PLAINTIFF

#### A.    Under Maryland Law, Plaintiff Must Prove That She Was Exposed to DES in Utero

Under Maryland law, a plaintiff must prove that she was exposed to the product she alleges caused her injuries. *See Foster v. Am. Home Prods. Corp.*, 29 F.3d 165, 168 (4th Cir. 1994) (applying Maryland law); *United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 410 (D. Md. 2005) (applying Maryland law); *Jensen v. Am. Motors Corp., Inc.*, 437 A.2d 242, 234 (Md. Ct. Spec. App. 1981). Accordingly, under Maryland law, if plaintiffs cannot prove exposure to a defendant's product, their claims fail as a matter of law. *See Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162-64 (4th Cir. 1986) (applying Maryland law in affirming a verdict in favor of defendant manufacturers when plaintiff did not demonstrate exposure to defendants' products); *Foster*, 29 F.3d at 172 (applying Maryland law and granting summary judgment in favor of defendant manufacturers when plaintiff did not demonstrate exposure to defendants' products). Thus, in the absence of admissible evidence that exposure to DES caused plaintiff's alleged inability to have a child, plaintiff's claims fail as a matter of law. *See id.*

138487v1

**B.    Plaintiff Has No Admissible Evidence That Her Mother Took DES During Her Pregnancy With Her**

In this case, plaintiff cannot meet her burden of proving that her mother ingested DES during her pregnancy with plaintiff.  Plaintiff has identified no one with personal knowledge of what, if anything, was prescribed to plaintiff's mother during her pregnancy with plaintiff.  Indeed, plaintiff's mother's doctor, Dr. Frawley, is deceased.  (SOF, ¶9.)

Plaintiff's only purported "evidence" that her mother took *something* during her pregnancy with her consists solely of plaintiff's mother's testimony.  However, plaintiff's mother has no personal knowledge of what she allegedly ingested during her pregnancy with plaintiff.  When originally asked by her daughter whether she took DES during her pregnancy, plaintiff's mother actually <u>denied taking DES</u> or "anything like that."  (SOF, ¶3.)  Plaintiff's medical records confirm her mother repeatedly denied taking DES.  (SOF, ¶6.)  Given plaintiff's mother's denial of taking DES, it is also not surprising that plaintiff has produced no medical, pharmacy or other records showing that her mother took DES during her pregnancy with her.  (SOF, ¶4.)  In fact, the pregnancy history section of plaintiff's mother's subsequent medical records contain absolutely no indication that she ingested DES during any of her pregnancies, including her pregnancy with plaintiff.  (SOF, ¶5.)

Plaintiff's mother's sudden "memory" of taking "diethbestrol" – a memory that occurred once plaintiff, who was crying and upset, told her mother that "she had gone to a doctor who said she couldn't have a baby because of that medication" – does not establish any personal knowledge of taking DES.  (SOF, ¶7.)  Furthermore, plaintiff's mother testified she remembers only that she took a pill that was aspirin-sized, white, round, and cross-scored.  (SOF, ¶11.)  She testified she does not recall any other details of the pill itself.  (SOF, ¶11.)  Plaintiff's mother testified that she does not remember Dr. Frawley telling her what he prescribed for her during her pregnancy with plaintiff.  (SOF, ¶10.)  Even if plaintiff's mother's sudden memory is

admissible on whether she really did take a pill during her pregnancy, there is absolutely **no** admissible evidence that that the pill she allegedly ingested was DES as opposed to any other pill.

Likewise, plaintiff's mother's testimony regarding the label on the prescription bottle she claims to recall after more than 40 years is inadmissible hearsay. Plaintiff's mother testified that the label, which she no longer has, read "diethylstilbestrol." (SOF, ¶10.) Such testimony, regarding the content of a label allegedly viewed over 40 years ago, is inherently unreliable. Further, the label is not available. For these reasons, plaintiff's mother's testimony regarding the label constitutes inadmissible hearsay.

Plaintiff's mother's testimony is not based in personal knowledge and thus, cannot be considered on summary judgment. *See Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 90 (D.D.C. 2006). Because plaintiff has identified no medical, pharmacy or other records documenting that her mother took DES during her pregnancy with plaintiff, or any other admissible evidence proving exposure, plaintiff cannot prove an essential element of her claim. Lilly is, therefore, entitled to judgment as a matter of law on this basis alone.

## IV.   PLAINTIFF'S CLAIMS FAIL BECAUSE SHE CANNOT PRESENT SUFFICIENT EVIDENCE OF CAUSATION

### A.   Under Maryland Law, The Preponderance Of The Evidence Standard Requires Plaintiff To Prove That It Is More Probable Than Not That Lilly Caused Her Alleged Inability To Have A Child

Even if plaintiff could prove exposure, which she cannot, plaintiff's claims still fail as a matter of law. Under Maryland law, to prevail upon her claims, plaintiff has the burden of proving that DES prevented her from having children. *See Marder v. G.D. Searle & Co.*, 630 F. Supp. 1087, 1088 (D. Md. 1968) (applying Maryland law) ("It is undisputed that it is plaintiff's burden to prove causation, as well as the other basic elements of liability."); *Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 467 (D. Md. 2000) (applying Maryland law) ("It is

138487v1

fundamental that a plaintiff has the ultimate burden of proof … as to each essential element of each cause of action asserted against a defendant. The plaintiff retains this burden throughout the case, and it never shifts to the defendant.") (internal citations omitted); *Owens v. Borns, Inc.*, 766 F.2d 145, 151 (4th Cir. 1985) (plaintiff must prove causation under claims sounding in negligence and strict liability).

Specifically, "[i]n order to demonstrate proximate cause, the burden is on plaintiff to prove by a preponderance of the evidence that is more probable than not that defendant's act caused his injury." *Fennell v. Southern Md. Hosp. Ctr.*, 580 A.2d 206, 211 (Md. 1990). In fact,

> The standard of proof in a civil action for compensatory damages is proof by a preponderance of the evidence – that is to say, a demonstration that each element is more likely so than not so. It is this standard of proof that generates the requirement that evidence of causation in a negligence or products liability case be established with reasonable certainty, or shown to be more probable than not, as anything less would not be proof by a preponderance of evidence.

*Samuel*, 112 F. Supp. 2d at 467. Under Maryland law, courts must take "special care … when assessing the sufficiency of causation evidence…" *Marder*, F. Supp. at 1089. In fact, "[i]t is particularly important to be assured that an inference of causation is based upon at least a reasonable probability of causation, in an effort to remove purely conjectural and speculative questions from the jury." *Id. See also Samuel*, 112 F. Supp. 2d 460, 471 ("speculative or conjecture evidence cannot establish the existence of an essential element of a claim to a reasonable degree of probability"). Indeed, in Maryland, "[p]robability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur). Mere possibility exists when the evidence is anything else." *Pierce v. Johns-Manville Sales Corp.*, 464 A.2d 1020, 1026 (Md. 1983). *See also Davidson v. Miller*, 344 A.2d 422, 427-28 (Md. 1975).

138487v1

Because of this preponderance of the evidence standard, Maryland courts have rejected loss of a chance claims.  Loss of a chance claims "may include [a claim for] loss of chance of a positive or more desirable medical outcome, loss of chance of avoiding some physical injury or disease, or loss of a chance to survive." *Fennell*, 580 A.2d at 208.  In a "loss of a chance" claim, a plaintiff claims a defendant's actions decreased the plaintiff's chance of a positive medical or other outcome, where the plaintiff's likelihood of achieving the positive outcome – outside of the defendant's conduct – was already improbable, or less than 50%.  *See Fennell*, 580 A.2d at 208.

Maryland courts cite various reasons for rejecting loss of a chance claims.  On causation grounds, they are "unwilling to relax traditional rules of causation" by recognizing a plaintiff's claim that a defendant caused the plaintiff to lose less than a 50% chance of a positive outcome.  *Fennell*, 580 A.2d at 211; *Goldberg*, A.2d at 718.  *See also Cooper v. Hartman*, 533 A.2d 1294, 1296-97 (Md. 1987) (noting that "traditional rules" require plaintiff "demonstrate a better than even chance of recovery" absent the harm the defendant allegedly caused and that "under traditional approaches, any injury suffered by the patient would not be compensable because it did not appear more likely than not that the patient would have survived with proper care").  On public policy grounds, courts have held that "[r]ecognition of loss of chance damages would allow a new form of damages as well as allow [claims] by an entirely new class of plaintiffs who traditionally have had no cause of action at common law" because plaintiffs "whose chances of surviving their pre-existing injuries or diseases were 50% or less had no cause of action for negligent treatment under traditional tort principles." *Fennell*, 580 A.2d at 214-15 (also citing fears of a "substantial explosion of tortfeasor liability and the accompanying societal costs" and the principle that "[d]eclaration of the public policy of Maryland is normally the function of the General Assembly").

Thus, unless a plaintiff can prove that the defendant caused a loss of more than a 50% chance of a better outcome, Maryland courts hold that "actual demonstrable harm, in all probability, did not occur." *Fennell*, 580 A.2d at 215. Thus, in order to recover for her alleged inability to have a child under Maryland law, plaintiff must establish that she lost **more than a 50% chance** conceiving and carrying a child to term due to Lilly's conduct. *See Fennell*, 580 A.2d at 211; *Cooper*, 533 A.2d at 1299-1300.

**B.    Under Maryland Law, In Pharmaceutical Cases Involving Questions of Medical Causation, A Plaintiff Must Use Expert Testimony To Prove Causation By A Preponderance Of The Evidence**

In a case like this one involving prescription medication and complex questions of medical causation beyond the understanding of a lay person, the plaintiff must prove causation through expert testimony. *See Aventis Pasteur, Inc. v. Skevofilax*, 914 A.2d 113, 135 (Md. 2007); *Brown v. Meda*, 537 A.2d 635, 641 (Md. Ct. Spec. App. 1988); *Samuel*, 112 F. Supp. at 467-68. If a plaintiff cannot provide expert testimony that carries the plaintiff's burden of proof on the element of causation, courts will hold that plaintiff's claims fail as a matter of law. *See Cooper v. Hartman*, 533 A.2d 1294, 1299-1300 (Md. 1987) (holding that, as a matter of law, expert testimony failed to prove causation by a preponderance of the evidence because the expert could not testify that, had the defendant not acted negligently, plaintiff would had a "substantial possibility," or a better than 50% chance, of a better result); *Owens v. Bourns, Inc.*, 766 F.2d 145, 150-51 (4th Cir. 1985) (granting a directed verdict on the issue of causation and determining that there was not "sufficient evidence of causation to raise an issue for the jury" when experts could not state with reasonable medical certainty that defendant's conduct was "more probably than not" the cause of the plaintiff's injury).[2]

---

[2]    *See also Goldberg*, 912 A.2d at 717 ("If a case calls for an investigation into the victim's chances of avoiding harm, courts generally require a medical expert to testify, with a reasonable degree of medical certainty, that the victim probably would have avoided the harm or achieved a better result but for the defendant's negligence. If the testimony

For example, in *Fennell v. Southern Maryland Hospital Center*, 580 A.2d at 207-08, the family of a woman who died from bacterial meningitis brought an action against the hospital and doctors who treated her, alleging that proper medical treatment would have increased her chance of survival. The plaintiffs provided testimony of an infectious disease expert who stated that, "had decedent been diagnosed and treated in accordance with the appropriate standard of care, she would have had a 40% chance of survival." *Id.* at 208. The defendants filed a motion for summary judgment on the ground that plaintiffs' expert testimony establishing a loss of a 40% chance does not meet Maryland's preponderance of the evidence standard. *Id.*

The *Fennell* court fleshed out the loss of a chance doctrine. It held that "[b]y loss of a chance, we mean the net loss of chance of survival directly attributable to the negligence" of the defendant. *Id.* at 209. The court explained, "[f]or example, if the patient had a 40% chance of recovery and negligent treatment reduced the plaintiff's chance of survival to 10%, then the actual loss of chance of survival would be 30%." *Id.* The court continued, "[p]atients whose chances of surviving their pre-existing injuries or diseases were 50% or less had no cause of action for negligent treatment under traditional tort principles. Although their chances of survival were decreased, survival was unlikely; and therefore, actual demonstrable harm, in all probability, did not occur." *Id.* at 215. After citing decisions in other jurisdictions which recognize loss of a chance claims, the court held:

> We are unwilling to relax traditional rules of causation and create a new tort allowing full recovery for causing actual death by causing a loss of less than 50% chance of survival. In order to demonstrate proximate cause, the burden is on the plaintiff to prove by a preponderance of the evidence that it is more probable than not that the defendant's act caused his injury.

---

indicates that there was only a fifty percent or lesser chance of avoidance or improvement, this probability is not established and the defendant prevails.") (internal citations omitted).

-13-

138487v1

*Id.* at 211 (internal citations omitted).

The court also rejected plaintiffs' request for loss of a chance damages, which "leav[e] the traditional rules of causation intact, but treat[] the loss of a chance as a way of approaching damages." *Id.* at 212 (internal citations omitted). Under the loss of a chance damages approach, some courts allow plaintiffs to recover only the percentage of their claimed injury consistent with the percentage share of lost chance attributable to the defendant. *See id.* The *Fennell* court soundly rejected loss of a chance damages, stating "Maryland law clearly does not allow damages based on mere probabilities." *Id.* at 213. Instead, "[d]amages must be proven by a preponderance of the evidence. Damages are not proven when it is more likely than not that death was caused by the antecedent disease or injury rather than the negligence of the physician." *Id.* at 214. Accordingly, the judge granted the defendants' motion for summary judgment. *Id.* at 215.

Additionally, in *Marder v. G.D. Searle & Co.*, 630 F. Supp. 1087 at 1095, the court held that plaintiffs failed as a matter of law to provide sufficient evidence of causation in their products liability claims against an intrauterine device ("IUD") manufacturer. In the case, the plaintiffs alleged that the IUD caused pelvic inflammatory disease, ectopic pregnancy, and perforation of the uterus. *Id.* at 1088. After stating that "it is the plaintiff's burden to prove causation, as well as the other basic elements of liability," *id.*, the court noted that "special care should be taken when assessing the sufficiency of causation evidence...." *Id.* at 1089. The court further explained that "[i]t is particularly important to be assured that an inference of causation is based upon at least a reasonable probability of causation, in an effort to remove purely conjectural and speculative questions from the jury." *Id.*

The court assessed the causation evidence presented by the expert witnesses in the case and determined that none of the expert testimony in the case was "sufficient to support a finding of a reasonable probability of causation." *Id.* at 1094. Specifically, two epidemiologists

-14-

testified that the IUD caused less than a 50% chance of increased risk of pelvic inflammatory disease. The court held that this testimony "brings the plaintiffs out of the range of probability and into mere speculation and possibility." *Id*. at 1092. Regarding this 50% standard, the court explained, "[i]n epidemiological terms, a two-fold increased risk is an important showing for plaintiffs to make because it is the equivalent of the required legal burden of proof – a showing of causation by the preponderance of the evidence or, in other words, a probability of greater than 50%." *Id*.[3]

After surveying the voluminous expert testimony presented in the case – the plaintiff alone presented two Ob-Gyns, an epidemiologist, a microbiologist, and experts on biomaterials and contraception – the court held:

> In essence, this case has dealt more with mere possibilities rather than probabilities. It is possible that the women suffered from tissue irritation from the copper, or that too much bacteria was transferred to the uterus at the time of insertion, or that the cervical barrier was broken … the **possibilities** may be endless. Yet the **probability** that any one of these events can occur has yet to be proven in this Court. **With this type of theoretical proof, the jury was forced into an exercise in speculation rather than reasoning**.

*Id*. at 1095. As a result, the court held "plaintiffs failed to present sufficient evidence of causation and a verdict must be entered in favor of defendant." *Id*.

## C.    Plaintiff Cannot Meet Her Burden of Proof In Presenting Admissible Expert Evidence That DES Caused Her Alleged Inability To Have A Child

Plaintiff claims that DES injured her by causing irregularities in her reproductive organs, preventing her from having the chance to give birth to children. Yet, none of plaintiff's

---

[3]    The court also rejected the testimony of an Ob-Gyn expert who testified that the IUD caused perforation of the uterus, leading to pelvic inflammatory disease. *Id*. at 1089-90. Regarding this expert's testimony that IUD users have a 10-20% increase in the occurrence of ectopic pregnancy and that IUDs can cause pelvic inflammatory disease, the court held that "[t]his chain of possibilities does not approach the degree of probability required" and, as a result, the expert's "testimony was insufficient to prove a probability that the [IUD] causes perforation." *Id*.

-15-

experts testified that plaintiff had a better than 50% chance of conceiving and carrying a child to term at the age of 43 absent any DES-related injury.  As such, plaintiff cannot prove causation by Maryland's preponderance of the evidence standard.

In fact, plaintiff's treater and medical expert, Dr. Stillman, could not testify that there was more than a 50% probability that DES caused plaintiff's inability to have a baby, as opposed to any other risk factor, such as advanced maternal age.  Plaintiff began attempting to conceive in May 2005, one month shy of her 43rd birthday.  (SOF, ¶12.)  Dr. Stillman testified in his deposition that, when plaintiff first visited him at age 43, he would have discussed with plaintiff her advanced reproductive age, "an important factor" in plaintiff's likelihood of conceiving and carrying a child to live birth.  (SOF, ¶15.)  Additionally, Dr. Stillman testified that plaintiff's uterine deformity causes no problems or difficulty to plaintiff outside of her reproductive capabilities.  (SOF, ¶19.)

Dr. Stillman could not testify that it is more likely than not that plaintiff, but for her alleged DES exposure, would have been able to conceive and carry a child to term.  (SOF, ¶1.)  Rather, he testified that both plaintiff's advanced maternal age **and** her alleged DES-related uterus shape are "contributing factor[s]" to plaintiff's inability to conceive and carry a child to term, but that "it's hard to know which one is the majority factor."  (SOF, ¶17.)

As a result, instead of demonstrating a probability that DES caused plaintiff's alleged inability to conceive and carry a child to term, she has only presented evidence of a possibility that DES caused her harm as opposed to her advanced reproductive age.  *See Pierce*, 464 A.2d at 1026 ("[p]robability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur).  Mere possibility exists when the evidence is anything else.").  Clearly, plaintiff has failed to "demonstrate proximate cause, [since] the burden is on plaintiff to prove by a preponderance of

-16-

the evidence that is more probable than not that defendant's act caused [her] injury," as opposed to any other reason for her alleged inability to have a child. *Fennell*, 580 A.2d at 211.

   Furthermore, plaintiff's claim is that, due to her alleged DES exposure, she lost her chance to conceive and carry a child. Yet, due to plaintiff's advanced maternal age, her chances of conceiving at age 43 – absent any reproductive injury – were already less than 50%. Dr. Stillman testified that even 43-year-olds **with no reproductive abnormalities** have a less than 50% chance of conceiving and carrying a child to term, even with the use of assisted reproductive technologies, such as intrauterine insemination or *in vitro* fertilization. (SOF, ¶14.) Additionally, he testified that in the general population, the likelihood of a 43-year-old having a live birth is "at least one in three" and the miscarriage rate of a 43-year-old who actually conceives is between 33-50%. (SOF, ¶15.) Indeed, at Dr. Stillman's fertility clinic, only 20% of 43-year-old women are able to conceive and only 14% of 43-year-old women are able to carry their pregnancies through to a live birth. (SOF, ¶16.) Since plaintiff cannot prove that Lilly caused a loss of more than a 50% chance of a better outcome – here, the ability to conceive and carry a child to term – under Maryland law, plaintiff cannot prove causation. *See Fennell*, 580 A.2d at 215; *Cooper*, 533 A.2d at 1296-97.

   Because plaintiff does not have case-specific expert testimony that she would have had a greater than 50% likelihood of having a child if she had not been exposed to DES, the court must grant Lilly's Motion for Summary Judgment dismissing plaintiff's claims. *See Celotex*, 477 U.S. at 322 (summary judgment "is mandated against" a party who fails to produce sufficiently probative evidence on an essential element of her case, upon which she would bear the burden of proof at trial); *Fennell*, 580 A.2d at 215, *Marder*, 630 F. Supp. at 1095; *Cooper* 533 A.2d at 1299-1300; *Owens*, 766 F.2d at 150-51.

138487v1

## CONCLUSION

Plaintiff cannot meet her burden of proving that she was exposed *in utero* to DES or that DES exposure caused her alleged inability to have a child, essential elements of her claims. Accordingly, defendant Eli Lilly and Company is entitled to summary judgment on all of plaintiff's claims.

WHEREFORE, defendant Eli Lilly and Company respectfully requests that the Court enter an Order granting summary judgment in favor of Lilly and against plaintiff, and granting such other and further relief as the Court deems just and proper.

Dated: April 3, 2007

Respectfully Submitted,

SHOOK, HARDY & BACON, L.L.P.

/s/ Emily J. Laird
Michelle R. Mangrum, D.C. Bar No. 473634
John Chadwick Coots, D.C. Bar No. 461979
Emily J. Laird, D.C. Bar No. 485890
600 14th Street, N.W., Suite 800
Washington, D.C. 20005-2004
(202) 783-8400 Telephone
(202) 783-4211 Facsimile

**ATTORNEYS FOR DEFENDANT
ELI LILLY AND COMPANY**

-18-

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and accurate copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, this 3rd day of April, 2007, which sent notification of such filing to all counsel of record listed below.

Aaron M. Levine
Aaron Levine & Associates
1320 19th St., N.W., Suite 500
Washington, D.C. 20036

**Attorneys for Plaintiff**


 /s/ Emily J. Laird
**ATTORNEY FOR DEFENDANT
ELI LILLY AND COMPANY**

-19-