IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~)
CATHERINE ANN DEEP,                    )
                                       )
                   Plaintiff,          )
                                       )         Civil Action No. 1:06-cv-00111 (RWR)
          vs.                          )         Next Event:
                                       )
ELI LILLY AND COMPANY,                 )
                                       )
                   Defendant.          )
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~)

**PLAINTIFF'S OPPOSITION TO DEFENDANT ELI LILLY AND COMPANY'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff Catherine Deep, through counsel, and opposes Defendant Eli

Lilly and Company's Motion for Summary Judgment, and as grounds therefore states:

1.  Plaintiff has produced enough evidence to allow a reasonable juror to find that she had

been exposed to diethylstilbestrol ("DES") *in utero*.  Plaintiff has a T-shaped uterus, a signature

DES injury.  Plaintiff's doctor testified at deposition that Plaintiff's uterus is one of the most

obviously DES-exposed he had ever seen.  Plaintiff's mother gave testimony that she took a

white, cross-scored pill in a bottle marked "diethylstilbestrol," a description consistent with

taking DES.  Defendant's argument regarding exposure is yet another repetition of its multiple

failed attempts to defeat DES plaintiffs on exposure, the last culminating in Cook v. Eli Lilly and

Co., Civil Action No. 05-0003406-B (D.C. Super. Dec. 23, 2006), Appendix 15 to attached

Memorandum.

2.  Plaintiff has produced enough evidence to allow a reasonable juror to find that her

infertility was caused by DES.  Defendant has already argued and lost this position in Kramer v.

Eli Lilly and Co., Civil Action 03-02325 (D.D.C. May 9, 2005), App. 16 to the attached

1

Memorandum. Defendant's position is that a forty-two-year-old woman must prove that she would have been completely fertile even if Defendant's wrongful act destroyed most of her potential to conceive a child and carry it to term. Plaintiff's position is that the fact that Plaintiff was forty-two as opposed to twenty-two may effect the extent of damages, but not the remedy.

Plaintiff's expert testified that her uterine injury was an "overriding factor" in her fertility preventing Plaintiff from going further. Plaintiff's other fertility factors (ovarian response) indicated good fertility. Plaintiff was not in menopause when she married. Plaintiff was rendered completely infertile by Defendant's drug, and the age factor goes to damages, not to liability.

**WHEREFORE** for the above reasons, for such other and further reasons as set forth in Plaintiff's memorandum and appendices attached, and for the reasons stated at oral argument, Plaintiff prays the Court to deny Defendant's Motion for Summary Judgment.

Respectfully Submitted,

AARON LEVINE & ASSOCIATES


_____/s/ Aaron M. Levine_____
Aaron M. Levine, # 7864
1320 19th Street, N.W., Suite 500
Washington, D.C. 20036
(202) 833-8040

Counsel for Plaintiff

## REQUEST FOR ORAL ARGUMENT
Pursuant to LCvR 7.1(f), Plaintiff requests an oral hearing of this Motion.
_____/s/ Aaron M. Levine_____
Aaron M. Levine, # 7864

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~)
CATHERINE ANN DEEP,                    )
                                       )
                    Plaintiff,         )
                                       )    Civil Action No. 1:06-cv-00111 (RWR)
          vs.                          )    Next Event:
                                       )
ELI LILLY AND COMPANY,                 )
                                       )
                    Defendant.         )
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~)


**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO
DEFENDANT ELI LILLY'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

I.    INTRODUCTION ................................................... 1
II. RESPONSE TO DEFENDANT'S STATEMENT OF FACTS ................................. 3
    A) PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
       UNCONTROVERTED MATERIAL FACTS ........................................ 3
    B) PLAINTIFF'S COUNTERSTATEMENT OF FACTS ........................... 7
III. STANDARD ON SUMMARY JUDGMENT ............................................. 8
IV.   PLAINTIFF CAN PROVE EXPOSURE ............................................ 10
    A) PLAINTIFF'S SIGNATURE INJURY SHOWS EXPOSURE TO DES .............. 10
    B) PLAINTIFF'S MOTHER'S TESTIMONY IS ADMISSIBLE TO SHOW EXPOSURE
       ...................................................................... 13
V.    DEFENDANT'S "CAUSATION" ARGUMENTS MISS THE POINT .............. 16
    A) KRAMER V. ELI LILLY AND CO. CONTROLS, AND PLAINTIFF'S EVIDENCE IN
       THIS CASE IS CLEARER THAN IN KRAMER ................................. 16
    B) THERE IS NO "LOSS OF CHANCE" ISSUE IN THIS CASE; LILLY'S ACTIONS
       CAUSED THE INJURY AND ANY SUBSEQUENT ACTS DO NOT CHANGE ITS
       LIABILITY ........................................................... 17
    C) DR. STILLMAN'S TESTIMONY SHOWS THAT DES WAS A SIGNIFICANT CAUSE
       OF PLAINTIFF'S INJURY ............................................... 20
VI.   CONCLUSION ................................................... 23

# TABLE OF AUTHORITIES

CASES

Aventis Pasteur v. Skevofilax, 914 A.2d 113 (Md. 2007) ........................................................ 21

Brooks v. Eli Lilly and Co., No. 03-cv-01796 (D.D.C. July 28, 2005) ............................... 11, 13

Bulthuis v. Rexall Corp., 789 F.2d 1315, 1319 (9th Cir. 1985) ..................................... 10, 11, 13

Commonwealth v. Harvey, 666 A.2d 1108 (Pa. Super. 1995) ..................................................... 15

Cook v. Eli Lilly and Co., Civil Action No. 05-0003406-B (D.C. Super. Dec. 23, 2006) .. passim

Cooper v. Hartman, 533 A.2d 1294 (Md. 1987) ................................................................. 19, 20

Czekalski v. Peters, 475 F.3d 360, 368 (D.C. Cir. 2007). ........................................................ 14

D'Amico v. Board of Medical Examiners, 520 P.2d 10 (Cal. 1974) ........................................... 9

Davidson v. Miller, 344 A.2d 422 (Md. 1975) .......................................................................... 20

Drayton v. Jiffee Chemical Corp., 591 F.2d 352 (6th Cir. 1978) .............................................. 15

Fennell v. Southern Md. Hosp. Ctr., 580 A.2d 206 (Md. 1990) .......................................... 18, 19

Gassmann v. Eli Lilly and Co., 407 F. Supp. 2d 203, 210 (D.D.C. 2005) ................................ 10

Goldberg v. Boone, 912 A.2d 698, 718 (Md. 2006) .................................................................. 18

Great Northern Ins. Co. v. Paino Assoc's, 364 F. Supp. 2d 7 (D. Mass. 2005) ........................... 8

Kogen v. Eli Lilly and Company, No. SACV 03-0962, Order Denying Defendant's Motion for
    Summary Judgment (D.C. Cal. July 22, 2003) ............................................................... 13, 14

Kramer v. Eli Lilly and Co., Civil Action 03-02325 (D.D.C. May 9, 2005) ................... 1, 10, 16

Marder v. G.D. Searle & Co., 630 F. Supp. 1087 (D. Md. 1986) ............................................. 21

Mayer v. North Arundel Hosp. Ass'n, 802 A.2d 483 (Md. Ct. App. 2002) ........................ 18, 19

Owens v. Bourns, Inc., 766 F.2d 145 (4th Cir. 1985) ............................................................... 21

Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C., 133 F. Supp. 2d 747, 757-758 (D. Md.
    2001) ........................................................................................................................... 17

Samuel v. Ford Motor Co., 112 F. Supp. 2d 460 (D. Md. 2000) .............................................. 20

Shields v. Eli Lilly and Co., 895 F.2d 1463, 1467 (D.C. Cir. 1990) ........................... 8, 9, 10, 13

United States v. Alvarez, 972 F.2d 1000 (9th Cir. 1992), cert den. 501 U.S. 977 (1993) .......... 15

Woolfolk v. Eli Lilly and Co., No. 03-3577, 2005 U.S. Dist. LEXIS 41193 (D. Wash. Mar. 15,
    2005) ....................................................................................................................... 11, 13

Yonce v. SmithKline Beecham Clinical Labs, 680 A.2d 569, 580 (Md. Ct. App. 1996) .......... 17

OTHER AUTHORITIES

The American Fertility Society, The American Fertility Society Classifications of Adnexal adhesions, Distal Tubal Occlusion, Tubal Occlusion Secondary to Tubal Ligation, Tubal Pregnancies, Mullerian Anomalies and Intrauterine Adhesions, 49 Fertility and Sterility (1988)

R. Apfel and S. Fischer, To Do No Harm, DES and the Dilemmas of Modern Medicine (Yale University Press 1984)

Richard L. Berman, M.D., Current Perspectives in Gynecology, 37 Clin. Symp. 1 (1985)

The Boston Women's Health Book Collective, The New Our Bodies, Ourselves: Updated and expanded for the 90's (Simon & Schuster, Inc. 1992)

Edward J. Brunet, et al., Summary Judgment Federal Law and Practice (2d ed. 2000)

CDC Resource Focuses on DES Exposure, 289 J. Amer. Med. Assn. 1624 (2003)

Edward W. Cleary, et al., McCormick on Evidence § 185, at 542-43 (3d ed. 1984)

F. Gary Cunningham, et al., Williams Obstetrics (21st ed. 2001)

Daughters At Risk: A Personal DES Story, (Doubleday 1981)

W.J. Dieckmann, M.D., et al., Does the Administration of Diethylstilbestrol During Pregnancy Have Therapeutic Value?, 66 Amer. J. of Ob. and Gyn. 1062 (1953)

The Greatest Experiment Ever Performed On Women, Seaman, Hyperion Press, (2003)

Hearing Before the Subcommittee on Government Operations, 92d Cong., Nov 11, 1971

Robert B. Hunt, M.D. & Alvin M. Siegler, M.D., Hysterosalpingography Techniques & Interpretation (Nancy G. Puckett ed., Year Book Medical Publishers, Inc. 1990

Robert B. Hunt, M.D., Text and Atlas of Female Infertility Surgery, 74, 270 (3rd ed. 1999)

Aaron Levine, Identification of Manufacturer of DES, 46 Proof of Facts 108 (1986)

National Institutes of Health, Were You Born Between 1938 and 1971 Or Pregnant Then? If So, You Could Be Exposed to DES (January 1995)

National Vital Statistics Reports, Vol. 55, No. 11 (Dec. 28, 2006) available at http://www.cdc.gov/nchs/data/nvsr/nvsr55/nvsr55_11.pdf

Cynthia Orenberg, DES: The Complete Story (St. Martin Press 1981)

Julie R. Palmer, et al., Infertility Among Women Exposed Prenatally to Diethylstilbestrol, 154 Am. J. of Epidemiology 316 (2001)

The Physician's Desk Reference to Pharmaceutical Specialties and Biologicals (Henrietta Bull, ed., Medical Economics, Inc. 15th ed. 1961)

The Physician's Desk Reference to Pharmaceutical Specialties and Biologicals (Henrietta Bull, ed., Medical Economics, Inc. 16th ed. 1962)

Leon Speroff, et al., Clinical Gynecologic Endocrinology and Infertility (6th ed. 1999)

## I.    INTRODUCTION

Plaintiff Catherine Deep has a uterus so severely deformed that there is no medical expectation that she could conceive a child with it, much less carry a child to term.  Plaintiff's experts say that this injury was due to *in utero* exposure to diethylstilbestrol ("DES"), and she has had this injury all her life.  DES exposure, which causes malformations of the uterus, is reported to cause greater than seven times the normal risk of infertility.  See Julie R. Palmer, et al., Infertility Among Women Exposed Prenatally to Diethylstilbestrol, 154 Am. J. of Epidemiology 316 (2001), attached as Appendix 1.  These deformities are pathognomonic and distinctive, and the testimony of Plaintiff's mother and Plaintiff's experts are sufficient to create a question of fact as to whether Plaintiff was exposed to DES.

Defendant's contention that DES is not the legal cause of Catherine Deep's infertility because Plaintiff's fertility may have declined due to age is neither logical nor Maryland law.  Catherine Deep was never fertile due to Defendant's drug.  When she was born, her uterus was already totally useless.  Even at age forty-two, the Plaintiff's uterus has value.  The evidence is that Plaintiff would have been more likely be able to conceive and carry a child to term and avoid the expense of medically assisting her fertility had she not been injured by DES.  If, at forty-two, Plaintiff had been in a negligently-caused car accident that cost Plaintiff her uterus, there would be no question that she had suffered a compensable loss.

All of Plaintiff's non-DES age-related infertility issues could be treated with medications and surgery, but her injury from DES cannot be.  In fact, Plaintiff's test results were promising for a woman her age, but her DES injuries are insurmountable.  She has never been and will never be able to get pregnant, with her eggs or with donor eggs, or carry a child to term due to DES.  That she discovered her infertility later in life does not change that fact.  This was the holding in Kramer v. Eli Lilly and Co., Civil Action 03-02325 (D.D.C. May 9, 2005), App. 16,

where a woman who was only ten percent fertile survived summary judgment because she presented evidence that her DES injury prevented her from the potential to carry a child. Plaintiff's case is far stronger than the one in <u>Kramer</u>, and Plaintiff deserves the opportunity to present it to a jury.

DES, a mid-20th century fertility nostrum, has been banned by the Food and Drug Administration, recalled by the manufacturers and branded a carcinogen and teratogen by the World Health Organization, the National Institutes of Health (NIH), the American College of Obstetrics and Gynecology, and every health organization devoted to reproductive medicine. <u>See</u> National Institutes of Health, "Were You Born Between 1938 and 1971 Or Pregnant Then? If So, You Could Be Exposed to DES" (January 1995), App. 2. Even Defendant Eli Lilly and Company ("Defendant" or "Lilly") admits it was a mistake. <u>See</u> Cynthia Orenberg, <u>DES: The Complete Story</u>, (St. Martin Press 1981); <u>The Greatest Experiment Ever Performed On Women</u>, Seaman, Hyperion Press, (2003); <u>Daughters At Risk: A Personal DES Story</u>, (Doubleday 1981).

The drug was sold to five to ten million women as a universal remedy to produce plump and healthy babies even though it never worked.[1] <u>See</u> <u>CDC Resource Focuses on DES Exposure</u>, 289 J. Amer. Med. Assn. 1624 (2003) at App. 3; W.J. Dieckmann, M.D., et al., <u>Does the Administration of Diethylstilbestrol During Pregnancy Have Therapeutic Value?</u>, 66 Amer. J. of Ob. and Gyn. 1062, 1074 (1953) attached at App. 4. Had Lilly performed the most rudimentary of testing on DES in humans or animals, prior to marketing DES for use in pregnancy, it would have discovered that the drug caused malformation, cancer, sterility and a plethora of reproductive tract malformations to the exposed daughter. <u>See</u> R. Apfel and S. Fischer, <u>To Do</u>

---

1. In 1968 the National Academy of Sciences in its review of the effectiveness of DES for the purpose of preventing threatened or habitual abortion found that effectiveness cannot be demonstrated by the literature or its own experience. <u>See</u> Hearing Before the Subcommittee on Government Operations 92nd Congress Nov 11, 1971, pg. 77. At this time Lilly was asked by the F.D.A. to provide evidence that DES was effective and failed to provide any such information.

<u>No Harm, DES and the Dilemmas of Modern Medicine</u> (Yale University Press 1984); Cynthia

Orenberg, <u>DES: The Complete Story</u>, <u>supra</u>; and Aaron Levine, <u>Identification of Manufacturer</u>

<u>of DES</u>, 46 Proof of Facts 108 (1986).

      DES was a time bomb with a forty-year fuse. Due to the delay in explosion, medical and

pharmacy records are lost, and Plaintiff did not learn about her inability to carry a child until she

entered her forties. This is not the fault of Ms. Deep, but the fault of Defendant's product. Lilly

seeks to take advantage of the passage of time to deprive Ms. Deep of her day in court on the

grounds that the records of her exposure have been lost. However, despite the multitude of

hurdles Plaintiff has had to overcome, she has presented sufficient evidence to raise a question of

fact that she was exposed to DES and that DES caused her infertility.

## II. RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

    A)    PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.    Admitted.

2.    Admitted.

3.    Denied as incomplete. Plaintiff's mother, Mary McGregor, stated that she did not

know that "DES" was short for "diethylstilbestrol" until Plaintiff spoke to her. Deposition of

Mary Catherine McGregor, pg. 61, Exhibit 2 to Def's Mtn. for Sum. Judg.

4.    Admitted.

5.    Denied as misleading. The documents presented by Defendant as its Exhibits 4

and 5 are standard medical intake forms designed to elicit general information about a patient.

On both forms, the "obstetrical history" section, which is where Defendant directs the attention

of the Court to notice an absence of DES, is a fill-in-the-blank chart with small, labeled columns,

none of which ask for DES exposure or for whether drugs were taken during a particular

3

pregnancy. In Defendant's Exhibit 5, Dr. Sine has filled it out in a cursory manner, only mentioning the number of children and method of delivery. There is nothing in the forms intended to reflect a woman's taking of DES or any other medication during her pregnancy or that such information would even be asked for by a physician working off one of these forms.

6.     Denied as incomplete. The note in Def's Exh. 6 refers to diethylstilbestrol exclusively as "DES." Plaintiff's mother did not associate the term "DES" with the drug she took during Plaintiff's pregnancy. See McGregor Deposition, pg. 61, Def's Exh. 2. There is no evidence that Ms. McGregor was asked at that time if she took "diethylstilbestrol."

7-9.     Admitted.

10.     Denied as incomplete. Plaintiff's mother also identified the name "Lilly" on the bottle. See McGregor Deposition, pg. 69, App. 5.

11.     Admitted.

12.     Denied. Plaintiff testified that she began trying to conceive in May of 2004. See Deposition of Catherine Deep, pg. 34, App. 6. She stopped all birth control at that time. Id., pg. 55. Plaintiff was therefore forty-two when she began to try to conceive.

13.     Denied as incomplete. See Affidavit of Robert Stillman, M.D., ¶ 2, App. 9. Dr. Stillman testified that when a woman comes to his practice, he tells them that their age "may" be a factor in their infertility. Stillman Deposition 82:21, Def's Exh. 2. In Ms. Deep's case, her severe uterine malformations from her exposure to DES overrode any obstacles to pregnancy due to her age. Stillman Deposition pg. 95:20, App. 8. All of the tests to date on Plaintiff's age-related fertility factors have been promising. Report of Robert Stillman, M.D., at pg. 1, App. 7. In Dr. Stillman's opinion, Plaintiff's uterus "is an overriding factor regardless of her age." Stillman Deposition, pg. 95, App. 8.

14.    Denied.  <u>See</u> Affidavit of Robert Stillman, M.D., ¶ 3, App. 9.  On page 97 of Dr. Stillman's deposition, he testified that a forty-three-year-old with no abnormalities has less than a 50% chance of a live birth, but on page 99 of his deposition, he testified that, sixty percent of normal women forty-three years of age would have a live birth with assisted reproduction.  Dr. Stillman clarified on page 98 that of women at age forty-three, there exist women with problems conceiving due to male factors or similar issues, and they have a reduced chance of successful conception.  Stillman Deposition, pg. 97-99, App. 8.  As Dr. Stillman stated in his report, male factors are not an issue in this case.  Stillman Report, pg. 1, App. 7.  Dr Stillman stands by his 60% chance of live birth figure on page 99:14-15.  Stillman Affidavit, ¶ 3, App. 9.

15.    Denied.  <u>See</u> Affidavit of Robert Stillman, M.D., ¶ 4, App. 9.  While Dr. Stillman stated on pg. 29 that the miscarriage rate for forty-three-year-olds who conceive is 33%-50%, he also testified on the same page that, in general, after conception, the chance of carrying the child to term is greater than fifty percent.  Stillman Deposition, pg. 29, Def's Exh. 2.  A majority of healthy forty-three-year-olds would have a live birth.  Stillman Deposition, pg. 99, App. 8.  The "general population," as construed by Defendant, includes people like Ms. Deep who have malformed uteruses due to DES and people like those mentioned by Dr. Stillman on page 98 who have husbands who had vasectomies.  As stated above, if the question regards the fertility of a healthy forty-three-year-old woman, she has a 60% chance of becoming pregnant and carrying the child to term with assisted reproduction.  <u>See</u> Affidavit of Robert Stillman, M.D., ¶ 4, App. 9.  Furthermore, as stated previously, Plaintiff was forty-two when she began trying to have a child, and so data about the forty-three year old population may not properly generalize to her injury.

16.    Denied as misleading.  <u>See</u> Affidavit of Robert Stillman, M.D., ¶ 5, App. 9.  Women come to an infertility clinic because they are less fertile than the general population.

5

Their fertility is not representative of women in their age group at large.  Stillman Deposition pg. 99-100, App. 8.  Furthermore, as stated in response to #12, Plaintiff was forty-two when she began her attempts to have a child, so the travails of forty-three-year-olds may not be relevant.

17.    Denied.  See Affidavit of Robert Stillman, M.D., ¶ 6, App. 9.  Dr. Stillman could not quantify exactly how much Ms. Deep's infertility is caused by her age as she is not a candidate for IVF due to her DES-malformed uterus, and IVF would be the only way to tell if her eggs are still good.  However, Dr. Stillman did testify that Ms. Deep's uterus is incompatible with having a baby with her own eggs or donor eggs; she would not have been able to have a baby at age twenty-five.  Stillman Deposition 96:15-18, App. 8.  Dr. Stillman testified that "this uterus, essentially, *in all reasonable likelihood*, precludes her [Plaintiff] from having a pregnancy."  Stillman Deposition, pg. 92, App. 8 (emphasis added).  Dr. Stillman described Plaintiff's uterus as "an overriding factor regardless of her age."  Id., pg. 95.  Dr. Stillman testified that Plaintiff's age is not the exclusive factor, as Plaintiff's "Clomid Challenge" test was promising.  Id., pg. 96.  Dr. Stillman "would be more concerned that age was also a more major factor at 47" than at Plaintiff's age with her test results.  Id., pg. 109.  All other fertility factors appear positive despite Plaintiff's age.  See Report of Dr. Stillman, pg. 1, App. 7.  Dr. Stillman further sets forth that Ms. Deep's age is not the major factor regarding her ability to conceive a child.  Stillman Affidavit, ¶ 8, App. 9.

18.    Denied.  See Affidavit of Robert Stillman, M.D., ¶ 7, App. 9.  Dr. Stillman testified that "this uterus, essentially, *in all reasonable likelihood*, precludes her [Plaintiff] from having a pregnancy," in response to Defendant's counsel's question regarding "reasonable medical probability."  Stillman Deposition, pg. 92, App. 8 (emphasis added).  Ms. Deep's uterus absolutely precludes her from carrying a child to term.  Id  Dr. Stillman testified that Plaintiff's

uterus "is an overriding factor regardless of her age."  Stillman Deposition, pg. 95.  Plaintiff's uterus at age twenty-five would have been incompatible with her having a child.  Id. at 96.

19.    Admitted.

B)    PLAINTIFF'S COUNTERSTATEMENT OF FACTS

20.    Mary McGregor's description of the pill she took when pregnant with Plaintiff matches Defendant's DES pill exactly.  See Photo of Eli Lilly's Diethylstilbestrol Pill and Bottle, App. 10.

21.    Mary McGregor was prescribed the pill which matches Lilly's DES in response to her spotting during pregnancy.  See McGregor Deposition pg. 35-36, Def's Exh. 2.  Dr. Julius Piver, who trained in obstetrics under Dr. Frawley, testified that the common practice in 1961-62 was to prescribe DES for staining during pregnancy.  Deposition of Julius Piver, M.D., pg. 14, 50, App. 11; Statement of Julius Piver, M.D., ¶ 3, App. 12.  Defendant's entries in the 1961 and 1962 Physician's Desk Reference ("PDR") for DES also recommended DES for the prevention of accidents of pregnancy.  See 1961 PDR pg. 625, 1962 PDR pg. 658, App. 13.

22.    Dr. Stillman testified at deposition that Plaintiff's uterine anomaly was so severe that only DES exposure would explain it, regardless of what Mary McGregor may have said to the contrary.  See Stillman Deposition, pg. 84-85, 87, App. 8.  Similarly, Dr. Piver stated that Plaintiff's uterus indicated DES exposure.  See Piver Deposition, pg. 49, App. 11.

23.    Plaintiff suffers from a "T-shaped" uterus and cervical stenosis.  See Stillman Report, pg. 1, App. 7. A T-shaped uterus is a signature of DES exposure.  See Selection of Medical Texts, App. 14.  Cervical stenosis is also a common symptom of DES exposure, although not unique to DES.  Id.

24.    Dr. Stillman testified that Plaintiff's uterus "essentially, in all reasonable likelihood, precludes her from having a pregnancy, much less an ongoing pregnancy."  Stillman

Deposition pg. 92, App. 8.  She is limited to a gestational carrier for any attempt at pregnancy.

Stillman Report, pg. 2, App. 7.

## III. STANDARD ON SUMMARY JUDGMENT

The Court must view the law and the facts in a light most favorable to the Plaintiff.  If the evidence presented raises more than the "slightest doubt," is more than "utterly implausible," presents more than a "mere scintilla" or contains more than a "metaphysical doubt," the nonmovant is entitled to go to trial.  See Edward J. Brunet, et al., Summary Judgment Federal Law and Practice 97-122 (2d ed. 2000).  In order to prevail, Lilly must present to the court facts that preclude the possibility that a reasonable juror could find in favor of the plaintiff.  The DES case of Shields v. Eli Lilly and Co., which centered on the sufficiency of proof in opposing summary judgment, sets the bar:

> In a world short of absolutes, the jury is called upon to process less than perfect evidence.  Litigants may not offer speculations or slight possibilities in support of their claims; but neither are they limited to offering only the incontrovertible.  The jury's function contemplates that evidence may be less than indubitable . . . . Every conceivable alternative theory of causation need not be extirpated by a litigant seeking the jury's decision.

Shields v. Eli Lilly and Co., 895 F.2d 1463, 1467 (D.C. Cir. 1990).  Similarly:

> Summary judgment should be granted only when the court, viewing the evidence in the light most favorable to the non-moving party, determines that no genuine issue of material fact exists . . . . Facts are 'material' if they possess 'the capacity to sway the outcome of litigation under the applicable law.'

Great Northern Ins. Co. v. Paino Assoc's, 364 F. Supp. 2d 7 (D. Mass. 2005).

> In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion.

D'Amico v. Board of Medical Examiners, 520 P.2d 10 (Cal. 1974).

> The "significantly probative" test does not require the nonmoving party to discredit every conceivable alternative theory of causation. As this court noted in Elliott v. Michael James, Inc., 165 U.S. App. D.C. 356, 507 F.2d 1179 (D.C. Cir. 1974), "there is no requirement that the circumstances, to justify the inferences sought, negative every other positive or possible conclusion." To be significantly probative, evidence need only be sufficient to permit a reasonable juror, indulging all possible inferences, to find that the party proved the element at issue.

Shields, 895 F.2d at 1465.

Plaintiff is entitled to every favorable inference that her mother and other witnesses are correct, accurate, and truthful. She is entitled to knit together the various pieces of evidence to construct a web of information and evidence.

> It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable. Thus, the common object that the inference for which the fact is offered 'does not necessarily follow' is untenable. It poses a standard of conclusiveness that very few single items of circumstantial evidence could ever meet. A brick is not a wall.

Edward W. Cleary, et al., McCormick on Evidence § 185, at 542-43 (3d ed. 1984).

Lilly has been repeatedly rebuffed in its quest for summary judgment on exposure in DES cases, even in cases with less evidence than presented here. Last December, Judge Judith Retchin of the D.C. Superior Court denied Lilly's motion for summary judgment on facts similar to this case. Cook v. Eli Lilly and Co., Civil Action No. 05-0003406-B (D.C. Super. Dec. 23, 2006), attached as App. 15. Less than two years ago, Judge Henry H. Kennedy of the Federal District Court for the District of Columbia ruled in another DES case that, "[t]he court is not only required to believe the competent evidence of the [Plaintiff], but must also grant all

reasonable inferences in her favor." Gassmann v. Eli Lilly and Co., 407 F. Supp. 2d 203, 210 (D.D.C. 2005).

Lilly has also lost its argument on causation. In Kramer v. Eli Lilly and Co., Civil Action 03-02325 (D.D.C. May 9, 2005), attached as App. 16, a woman with seriously diminished ovarian reserve related to her age sued for infertility from DES. The Court, applying Maryland law, held that with evidence that the Plaintiff would have been fertile but for DES, the lawsuit could proceed. Mem. Op. at 6, App. 16. Plaintiff has presented evidence both of exposure and that DES rendered Plaintiff totally infertile before any aging effects took place. Summary judgment is inappropriate.

## IV.    PLAINTIFF CAN PROVE EXPOSURE

### A)    PLAINTIFF'S SIGNATURE INJURY SHOWS EXPOSURE TO DES

It is well-settled law that an individual can prove exposure to DES by showing the typical symptoms. In Shields v. Eli Lilly and Co., 895 F.2d 1463, 1467 (D.C. Cir. 1990), Ms. Shields's mother's doctors were deceased and all her prenatal records were gone. She had nothing to document her DES exposure. Id. at 1464. However, Ms. Shields's mother testified that she was prescribed a pill for staining, and Ms. Shields's doctors said that Ms. Shields's injuries were most likely a result of DES exposure. With this evidence, nearly the exact evidence presented in this case, summary judgment was overturned.

In Bulthuis v. Rexall Corp., 789 F.2d 1315, 1319 (9th Cir. 1985), the drug company defendants submitted evidence that the prescribing physician generally prescribed progesterone to prevent miscarriages, not DES; testimony from the mother that she told her physician that she took progesterone; and further testimony from the mother that the drug she took when pregnant with plaintiff was the same as the drug she took with a younger son (progesterone). Id. at 1318.

10

In opposition, the plaintiff presented evidence that, although the mother could not remember DES by name, two of plaintiff's treating physicians submitted affidavits stating that plaintiff's vaginal tissue exhibited changes caused by DES exposure and were rarely seen in the unexposed. Id. at 1316.  Despite this less-than-perfect evidence, the Ninth Circuit stated:

> Dr. Townshend [one of plaintiff's treating physicians] stated that the changes he observed in plaintiff's tissue were "commonly seen in DES-exposed offspring and rarely seen in non-DES exposed individuals."  This was a statement of fact, and it is a reasonable inference from this fact that plaintiff's mother had taken DES during her pregnancy with plaintiff.  As the party against whom summary judgment was sought, plaintiff was entitled to have such inferences drawn in her favor.

Id. at 1317.

In Woolfolk v. Eli Lilly and Co., No. 03-3577, 2005 U.S. Dist. LEXIS 41193 (D. Wash. Mar. 15, 2005), App. 17, plaintiff's mother was unable to recall the name of the drug she ingested, nor the color or size of the pills.  There were no records from plaintiff's pregnancy and the prescribing physician was deceased.  Yet the court found that, based upon medical testimony that her particular combination of injuries was typical of DES exposure, the plaintiff had created enough triable issues of fact to survive summary judgment.  Id. at *5-6.

Woolfolk was positively cited in Brooks v. Eli Lilly and Co., No. 03-cv-01796 (D.D.C. July 28, 2005), as App. 18.  In Brooks, the mother could not recall the name of the drug she was prescribed.  However, plaintiff's injuries, as in the present case, were found to be consistent with DES exposure and the District Court denied summary judgment to Lilly.

Like the plaintiffs in Bulthuis, Woolfolk, and Brooks, Ms. Deep suffers from typical DES-related cervical and uterine deformities.  She has cervical stenosis and a T-shaped uterus, signs of DES exposure.  See Stillman Report, App. 7.  Dr. Stillman testified that Ms. Deep's uterine anomalies are pathognomonic with DES exposure – that the injury to the uterus is the

kind only caused by DES.  see Stillman Deposition pg. 84-85, App. 8.  Dr. Piver concurs.  Piver

Deposition pg. 50, App. 11.

    Ms. Deep's anatomical injures are consistent with DES exposure with

virtually all of the peer reviewed and accepted medical texts on the subject.  See

Selections from Major OB/GYN Texts, App. 14, Attachments A-G:

| | |
|---|---|
| Attachment A: | F. Gary Cunningham, et al., <u>Williams Obstetrics</u> 920 (21st ed. 2001), the foremost text on obstetrics, describes Plaintiff's injury of a "T-shaped" uterus as being caused by DES; |
| Attachment B: | The American Fertility Society, <u>The American Fertility Society Classifications of Adnexal adhesions, Distal Tubal Occlusion, Tubal Occlusion Secondary to Tubal Ligation, Tubal Pregnancies, Mullerian Anomalies and Intrauterine Adhesions,</u> 49 Fertility and Sterility, Table 5 (1988), describes Plaintiff's injury, a "T-shaped" uterus as being caused by DES; |
| Attachment C: | Robert B. Hunt, M.D. & Alvin M. Siegler, M.D., <u>Hysterosalpingography Techniques & Interpretation</u> 59-61 (Nancy G. Puckett ed., Year Book Medical Publishers, Inc. 1990), described Plaintiff's injury of a "T-shaped uterus" as being caused by DES; |
| Attachment D: | The Boston Women's Health Book Collective, <u>The New Our Bodies, Ourselves: Updated and Expanded for the 90's,</u> 584 (Simon & Schuster, Inc. 1992), describes Plaintiff's injury of a "T-shaped uterus" as being caused by DES; |
| Attachment E: | Leon Speroff, et al., <u>Clinical Gynecologic Endocrinology and Infertility</u> 147 (6th ed. 1999) attached hereto as App. 14, described Plaintiff's injury of a "T-Shaped uterus" as being caused by DES. |
| Attachment F: | Robert B. Hunt, M.D., <u>Text and Atlas of Female Infertility Surgery</u>, 74, 270 (3rd ed. 1999) describes Plaintiff's injury of a "T-shaped uterus" as being caused by DES. |

Attachment G:      Richard L. Berman, M.D., <u>Current Perspectives in Gynecology</u>, 37 Clin. Symp. 1, 22 (1985) describes Plaintiff's injury of a "T-shaped" uterus as being caused by DES.

Both medical texts and the courts agree that one can infer exposure to DES from this kind of uterine malformation.  In <u>Kogen v. Eli Lilly and Company</u>, No. SACV 03-0962, Order Denying Defendant's Motion for Summary Judgment (D.C. Cal. July 22, 2003) attached as App. 19, the Court denied Lilly's motion for summary judgment which argued there was no evidence of exposure to defendant's DES when the plaintiff's mother did not recall the name of the drug she ingested.  The Court found that "plaintiff [had] put forth credible expert medical testimony showing that Ms. Kogen has a T-shaped uterus as a result of DES exposure."  <u>Id.</u>

As stated <u>infra</u>, Plaintiff's mother can identify the drug she took more accurately than the plaintiffs in <u>Shields</u>, <u>Woolfolk</u>, <u>Brooks</u>, and <u>Bulthuis</u>.  Recently the D.C. Superior Court in <u>Cook v. Eli Lilly and Co.</u>, Civil Action No. 05-0003406-B (D.C. Super. Dec. 23, 2006), App. 15, considering this same issue, held that indicia of DES exposure, even if not conditions exclusive to DES exposure, are enough to create a factual dispute with testimony from the mother.  <u>Id</u>. Here, the expert testimony is that Plaintiff's uterus suffers from a unique DES-related condition.

<u>Shields</u>, <u>Woolfolk</u>, <u>Brooks</u>, <u>Kogen</u>, and <u>Bulthuis</u> state that Ms. Deep's malformed reproductive organs, combined with the testimony of a medical professional that DES causes those malformations, are enough to allow a jury to decide whether or not a woman was exposed to DES.  Here, Plaintiff's treating doctor will testify that her reproductive deformities are due to DES exposure.  <u>See</u> Stillman Depo, pg. 84-85, App. 6.  Such evidence raises a question of fact to defeat summary judgment.

B)    PLAINTIFF'S MOTHER'S TESTIMONY IS ADMISSIBLE TO SHOW EXPOSURE

In <u>Cook v. Eli Lilly and Co.</u>, Civil Action No. 05-0003406-B (D.C. Super. Dec. 23, 2006), App. 15, the Court found that "[p]laintiff's mother's description of what she was prescribed (and took)" was both admissible, non-hearsay evidence and created a question of fact to defeat summary judgment. <u>Id</u>. In the present case, as in <u>Cook</u>, Plaintiff's mother describes a drug which a jury could find was DES.

Mary McGregor stated that she took a white pill with an "X" on it from a bottle with a "diethylstilbestrol" label during her pregnancy. McGregor Deposition pgs. 36-37, Def's Exh. 2. Ms. McGregor further stated that the pills she took were prescribed in response to her experiencing bleeding during pregnancy and to prevent miscarriage. McGregor Deposition at 35-36, Def's Exh. 2.

Defendant Lilly manufactured a form of DES in a white, cross-cut pill shape – the same shape as identified by Mary McGregor. <u>See</u> Photo of Eli Lilly's Diethylstilbestrol Pill and Bottle, as App. 10. At the time of Mary McGregor's pregnancy with Catherine, Lilly promoted DES for mothers who experienced bleeding during pregnancy and other signs or threatened miscarriage. 1961 PDR pg. 625, 1962 PDR pg. 658, App. 13. Dr. Piver, who trained with Dr. Frawley, states that it was the custom and practice for doctors to prescribe DES for the indications presented by Mary McGregor. Statement of Julius Piver, M.D., ¶3, App. 12.

In <u>Kogen v. Eli Lilly and Co.</u>, No. SACV 03-0962, Order Denying Defendant's Motion for Summary Judgment (D.C. Cal. July 22, 2003) attached as App. 16, the Court denied Lilly's motion for summary judgment which argued there was no evidence of exposure to defendant's DES when the plaintiff's mother did not recall the name of the drug she ingested. There, the taking of a white, cross-cut pill alone was enough to create a triable issue of fact as to DES

exposure.  A jury may infer that an Eli Lilly drug that looks just like Eli Lilly's DES and was given to Mary McGregor for a condition for which DES was prescribed is, in fact, DES.

Defendant's allegation that Ms. McGregor's memory is "sudden" does not change the calculus on summary judgment.  A dispute based on a witness's credibility cannot be resolved at summary judgment.  See Czekalski v. Peters, 475 F.3d 360, 368 (D.C. Cir. 2007).  If Defendant wishes to challenge the accuracy of Ms. McGregor's recollections, it can do so at trial.

Furthermore, Ms. McGregor's recollection of the label is admissible and not hearsay. The recollection of labels are held admissible to prove the identity or contents of the item labeled.  In Commonwealth v. Harvey, 666 A.2d 1108 (Pa. Super. 1995), witnesses were allowed to testify that a beverage can read "Busch" to establish that there was beer of a certain alcohol content inside.  666 A.2d at 1112.  In United States v. Alvarez, 972 F.2d 1000 (9th Cir. 1992), cert den. 501 U.S. 977 (1993), a federal agent was allowed to testify to the inscription on a firearm to show that the firearm was manufactured in Spain and thus traveled in interstate commerce.  972 F.2d at 1004.  The items themselves were never introduced into evidence.

In Drayton v. Jiffee Chemical Corp., 591 F.2d 352 (6th Cir. 1978), the bottle of allegedly defective drain cleaner was never recovered.  591 F.2d at 356.  In fact, there was significant physical evidence that the chemicals that caused the injury were not in defendant's drain cleaner, but that of a competitor.  Id.  Despite the lack of a physical bottle and the countervailing evidence, witnesses were allowed to testify that the label on the bottle matched the defendant's product.  Id.

Regarding DES cases, Cook v. Eli Lilly and Co., supra, establishes that a mother's testimony as to what she took is admissible evidence.  See Cook, App. 15. There is no reason why Ms. McGregor cannot testify to the label on the bottle of pills she took while pregnant with

Plaintiff.   DES is not asprin; one does not take a pill once in a while.   DES was a drug Ms.

McGregor took every day, multiple times a day, for nine months, and did so in order to save her

child.    Is it inherently unbelievable for Ms. McGregor to remember a pill which she took three

times a day for almost a year and believed brought her child into existence?

## V.    DEFENDANT'S "CAUSATION" ARGUMENTS MISS THE POINT

### A)    KRAMER V. ELI LILLY AND CO. CONTROLS, AND PLAINTIFF'S EVIDENCE IN THIS CASE IS CLEARER THAN KRAMER

In Kramer v. Eli Lilly and Co., Civil Action 03-02325 (D.D.C. May 9, 2005), a woman

with age-related and demonstrably poor signs of fertility claimed that DES caused her injuries.

Kramer, Slip Op. at 4, App. 13 (noting that Kramer's high FSH values and poor "Clomid

Challenge" test results indicated a poor likelihood of pregnancy).   Her expert witness testified

that Kramer's eggs alone caused ninety percent of her infertility.   Id. at 5.   Judge Kennedy found

that, nonetheless, Ms. Kramer's DES injuries were a significant cause of her infertility, and

summary judgment was denied on the same argument mounted herein.   Slip Op. at 6, App. 16.

Plaintiff's treating physician says that here, unlike Kramer, tests of Plaintiff's other

fertility factors have been promising.   Stillman Report, pg. 1, App. 7 (Plaintiff has "normal

hormonal blood levels" and good "Clomid Challenge" test results); Stillman Deposition, pg. 109,

App. 8 (cannot conclude age is the sole factor in infertility without high FSH levels); Stillman

Affidavit, ¶ 8, App. 9 ("Her age is not the major factor regarding her ability to conceive a

child").   Taking the evidence in the light most favorable to Plaintiff, she had, at forty-two

substantial (even if not 50%) fertility.   Her DES injuries took all of that potential away.

Defendant bases its causation argument on general statements regarding over-forty-year-

old women, none of which it ties to Defendant with any evidence.   Dr. Stillman has repeatedly

stated that DES is the "overriding cause" and the cause "in all reasonable likelihood" of

Plaintiff's infertility.  More than <u>Kramer</u>, Plaintiff has set forth evidence that not only did DES cause her infertility, but that she could conceive a child and carry it to term but for Defendant's DES.

**B)    THERE IS NO "LOSS OF CHANCE" ISSUE IN THIS CASE; LILLY'S ACTIONS CAUSED THE INJURY AND ANY SUBSEQUENT ACTS DO NOT CHANGE ITS LIABILITY**

Dr. Stillman has testified that Plaintiff Catherine Deep's uterus is useless for a pregnancy due to her DES exposure.  A forty-two-year-old uterus in an otherwise healthy woman is not "useless."  Regardless of whether using Plaintiff's eggs or donor eggs is a more effective way to gain a fertile embryo, DES made it impossible for Plaintiff to bear her own child.  At the peak of her fertility, she would have required a gestational surrogate to bear her own children, just as she does now.  Furthermore, Defendant's argument overlooks that, even if Plaintiff's eggs were never viable, Plaintiff would experience additional difficulty and economic hardship by not being able to carry children in her own uterus.

All Defendant's "causation" argument boils down to is that Ms. Deep's waiting until forty-two to have a child is a superseding cause of her infertility.  Under Maryland law, "the non-negligent act of a plaintiff is not a superseding cause if it was foreseeable."  <u>Yonce v. SmithKline Beecham Clinical Labs</u>, 680 A.2d 569, 580 (Md. Ct. App. 1996).  In <u>Yonce</u>, the defendant negligently destroyed amniocentesis samples; the plaintiff then underwent a second amniocentesis which resulted in the loss of her unborn twins.  680 A.2d at 574.  The Maryland Court of Appeals held that the plaintiff's decision to have a second amniocentesis, even though that act increased the risk of harm to her unborn children, did not relieve defendant of its liability for its negligence.  680 A.2d at 581.  In <u>Yonce</u>, the second amniocentesis was considered reasonable, but even if Plaintiff could be considered negligent in failing to attempt to have a

child earlier in life, contributory negligence is unavailable when the plaintiff's act of negligence occurs "well after" the defendant's negligence.  See Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C., 133 F. Supp. 2d 747, 755 (D. Md. 2001). That Plaintiff waited to become a mother, which may have reduced her potential to become pregnant, does not extirpate Defendant's negligence in promoting an untested, unsafe, and inefficacious drug.

Md. Civ. Pattern Jury Inst. § 10:3 states that:

> The effect that an injury might have upon a particular person depends upon the susceptibility to injury of the plaintiff.  In other words, the fact that the injury would have been less serious if inflicted on another person should not affect the amount of damages to which the plaintiff may be entitled.

Even if Plaintiff had diminished egg quality due to her age (of which there is no evidence), such a condition makes her more susceptible to a DES infertility and does not relieve Defendant for the injuries it brought about.

Defendant argues, based primarily on Fennell v. Southern Md. Hosp. Ctr., 580 A.2d 206 (Md. 1990), a medical malpractice death case, that Plaintiff must show that Defendant caused the most significant amount of Plaintiff's infertility to recover.  See Def's Mtn. for Sum. Judg. at 10. However, Fennell and Defendant's other cases are not applicable to a case where a drug demonstrably caused physical defects in advance of any other factors.

In Mayer v. North Arundel Hosp. Ass'n, 802 A.2d 483 (Md. Ct. App. 2002) where it was alleged that medical negligence caused an irreversible brain injury and "any subsequent act of negligence would have caused less than the entire injury," the "loss of chance" doctrine as stated in Fennell was held inapplicable.  801 A.2d at 489.  Here, the unquestioned testimony is that Catherine Deep has an extremely deformed uterus and cervix and has had them all her life due to Defendant's defective drug.

Defendant cites to the definition of loss of chance in <u>Goldberg v. Boone</u>, 912 A.2d 698, 718 (Md. 2006), <u>see</u> Def's Mem. at 12, but ignores that the Maryland Court of Appeals stated that when a suit is about whether "the plaintiff was not informed of specific data material to his or her decision to undergo the treatment," the complaint may proceed even if the chance of a better outcome might not have been more likely than not.  912 A.2d at 718.  One of Plaintiff's causes of action is the negligent failure to warn, a cause of action not unlike failure to give informed consent.  <u>See</u> Complaint ¶5, Def's Exh. 1.  The loss of chance doctrine is inapplicable to that cause of action.

The cited loss of chance cases are further inapplicable as they are all medical malpractice cases involving a pre-existing disease and either involve the death of a patient or fail to establish that malpractice occurred at all.  <u>Fennell</u> is a medical malpractice case involving a belated CT scan.  Before any negligence occurred, the decedent already had meningitis.  Testimony was that, even if the CT scan been done in a timely manner, the patient was already dying and was not likely to survive.  580 A.2d at 208.  In a case involving a negligently-caused death, such as <u>Fennell</u>, damages are for the entire death where the negligent act may have been a significant but minor cause in the death.  Much of the opinion in <u>Fennell</u> is the court's hesitancy to charge doctors with the entire bill of the wrongful death when the overriding odds were that the patient would have died regardless. <u>Id</u>. at 215.  Here, testimony is that the overriding cause is Defendant's DES; furthermore, unlike a medical malpractice death case, Plaintiff here seeks only that portion of her infertility caused by Defendant's DES, an injury caused by Defendant's negligence before any other factors.

<u>Cooper v. Hartman</u>, 533 A.2d 1294 (Md. 1987), another "loss of chance" case, is another medical malpractice case.  533 A.2d at 1296.  In <u>Cooper</u>, the plaintiff had an infection before he

19

went to the doctor, and complained that the doctor did not treat the infection aggressively enough. Id. at 1295. There, the testimony was that it was "possible" that the defendant's negligence made the pre-existing bad situation worse. Id. at 1298. However, the plaintiff's experts could not establish that more aggressive treatment would have prevented the complained-of injury. Id. at 1298-99. Dr. Stillman has testified that Defendant's DES caused an observable injury to Plaintiff. That injury due to Defendant's negligence was the first and overriding blow to Plaintiff's fertility, and neither Cooper nor Fennell show that such damages from provable first negligence are not recoverable.

C)    DR. STILLMAN'S TESTIMONY SHOWS THAT DES WAS A SIGNIFICANT CAUSE OF PLAINTIFF'S INJURY

Dr. Stillman testified that Ms. Deep's DES-malformed uterus was the "overriding cause" of her infertility. Stillman Deposition at pg. 95, App. 8. Defendant's cases regarding the level of certainty that an expert witness must show do not say that there can be no uncertainty about the numeric percentages involved. The cases do not say that an "overriding cause," or a cause "in all reasonable likelihood" is insufficient unless accompanied by a percentage or the words "reasonable medical probability" are mentioned by an expert. In fact, Samuel v. Ford Motor Co., 112 F. Supp. 2d 460 (D. Md. 2000), cited by Defendant, states that experts need not use such magic words in their testimony. Id. at 470. Instead, Defendant's cases on causation merely state that one should have an expert witness who actually ties the injury to the cause.

For example, the experts in Cooper v. Hartman, 533 A.2d 1294 (Md. 1987) refused to say with any certainty that the malpractice at issue led to the prolonged infection suffered by the plaintiff. One expert said that a better outcome was "possible" if the malpractice had not occurred. 533 A.2d at 1298. The other expert said that "usually" the outcome is better. Id. The inability of the experts to say anything close to the words "substantial probability" – and they

certainly did not use the term "overriding cause" – was why the plaintiff did not meet his burden in Cooper. Id. at 1299.

In Davidson v. Miller, 344 A.2d 422 (Md. 1975), pg. 10 of Def's Mem., the expert for a victim of an auto accident was an orthopedic surgeon. He refused to testify as to the ability of the injured child to bear children without a caesarean section, saying that such a determination "will require the services of an expert obstetrician." 344 A.2d at 426. The Maryland Court of Appeals found that deferring to a nonexistent second expert is not enough to create a question of causation. Id. at 428. Similarly, Aventis Pasteur v. Skevofilax, 914 A.2d 113 (Md. 2007), pg. 12 of Def's Mem., is a case where summary judgment was granted to defendants because plaintiffs' expert witness quit during discovery and was not replaced. 914 A.2d at 119. Defendant does not contest that Dr. Stillman's testimony is relevant to the issue at hand and that Dr. Stillman is competent to testify to these matters; therefore, Davidson and Aventis are not relevant to the instant case.

In Marder v. G.D. Searle & Co., 630 F. Supp. 1087 (D. Md. 1986), a multitude of experts posited that a particular intrauterine device could cause pelvic inflammatory disease. However, no expert testified that he or she had ever diagnosed a particular injury as caused by the intrauterine device in question. 630 F. Supp. at 1095. The plaintiffs presented no treating physicians to link their injuries to the intrauterine device. Id. at 1094. Furthermore, the District Court in Marder found the majority of witnesses to have no scientific basis for their conclusions, or testified about intrauterine devices generally and not the one at issue in the case. Id. at 1090-1093. With such a paucity of information, the District Court found causation a mere possibility. Id. at 1095. Marder is perhaps applicable for the opposite proposition in the present case; here, Defendant is citing an expert's general statements on the fertility of over-forty women without

any reference to the present case in order to show that Plaintiff is infertile due to age-related causes. Such a linkage, according to Marder, cannot be made. Instead, the Court should credit Dr. Stillman's testimony that DES was an "overriding cause" of Plaintiff's infertility.

In Owens v. Bourns, Inc., 766 F.2d 145 (4th Cir. 1985), plaintiffs blamed excessive oxygen from a ventilator for an infant's blindness. However, the infant had been exposed to excessive levels of oxygen at numerous times and from sources other than the ventilator. Id. at 149. Plaintiffs' experts testified that science could not establish how much oxygen or how long exposure needed to be to cause blindness. Id. at 148-49. Therefore, the Fourth Circuit did not allow the experts to tie the blindness to the ventilator. Id. at 150. The present case is not one where multiple incidents could have caused an injury. This case is one where Plaintiff had an injury that robbed her of her fertility, and then perhaps age related factors reduced her overall chances. If a thief steals a lottery ticket, could the thief succeed against a claim for conversion by saying that the rightful owner "probably would have lost anyway"?

Unlike Defendant's cases, Dr. Stillman is Ms. Deep's treating physician and diagnosed her DES injury as a significant cause of her infertility and her ability to carry a child to term, which Defendant does not dispute. That he did not put an exact number on the competing causes of Plaintiff's infertility does not render his testimony insufficient to prove causation.

VI.    **CONCLUSION**

Plaintiff has a T-shaped uterus that her treating physician and another expert agree is typical of DES exposure.  Plaintiff's mother remembers taking during pregnancy a white, cross-scored pill out of a bottle labeled "diethylstilbestrol" – a recollection consistent with her taking DES.  Plaintiff's mother took this pill for conditions for which Lilly and doctors at the time recommended the use of DES.

Defendant's argument regarding exposure is the same as the one it lost in <u>Cook v. Eli Lilly and Co.</u>, <u>supra</u>, and countless times before.  Since Plaintiff's circumstantial and direct evidence demonstrates that her reproductive injuries to a reasonable degree of medical probability were more likely than not caused by exposure to Diethylstilbestrol, Plaintiff has created a question of fact to survive summary judgment.

No woman has 100% fertility.  The reproductive tract is not a bone that is either broken or unbroken.  The ability to conceive and carry a child is a multi-factored phenomenon.  Here, DES is a significant contributing factor to Plaintiff's infertility, and such a factor should be compensable.

Therefore, Defendant's Motion for Summary Judgment should be denied, as Defendant's identical motions have been previously.

> Respectfully Submitted,
> AARON LEVINE & ASSOCIATES
>
>
> _____/s/ Aaron M. Levine_____
> Aaron M. Levine, # 7864
> 1320 19th Street, N.W., Suite 500
> Washington, D.C. 20036
> (202) 833-8040
>
> Counsel for Plaintiff